## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,**

     **Plaintiffs**

     v.                         **Civil Action No.  97-807 (JGP)**

**DISTRICT OF COLUMBIA FINANCIAL
RESPONSIBILITY AND MANAGEMENT
ASSISTANCE AUTHORITY, et al.,**

     **Defendants**

**FILED**

SEP 2 1 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### MEMORANDUM

Currently pending before the Court are defendants' **Motion to Dismiss Plaintiffs' Amended Complaint** and plaintiffs' **Motion for Summary Judgment**.  For the reasons set forth in this memorandum, defendants' Motion to Dismiss Plaintiff's Amended Complaint is denied and plaintiffs' Motion for Summary Judgment is granted.

### BACKGROUND

Pursuant to Article I, section 8, clause 17 of the United States Constitution, Congress exercises plenary legislative power over the national capital, the District of Columbia ("District"). In 1995, finding the District to be suffering extreme financial problems such as budget deficits, cash shortages, and management inefficiencies, Congress passed the District of Columbia Financial Responsibility and Management Assistance Act of 1995 ("FRMAA"), Pub. L. No. 104-8, 109 Stat. 97 (1995).

FRMAA established the District of Columbia Financial Responsibility and Management Assistance Authority ("Control Board") to combat the District's financial and management

problems. Under FRMAA's terms, the Control Board operates independently of the District's local government. Neither the District's mayor nor elected Council may exercise control, supervision, oversight, or review of the Control Board or its activities. See FRMAA, § 108. Furthermore, the Control Board is not bound by the same laws and rules which govern the activities of other organs of the District government, with the exception of the District's Government in the Sunshine Act, portions of the District's Freedom of Information Act, and the District's Campaign Finance Reform and Conflict of Interest Act. Id. Jurisdiction over claims involving the Control Board is vested in the United States District Court for the District of Columbia. FRMAA, § 105.

The Control Board's mandate from Congress requires it to make recommendations to the Mayor and the Council regarding the financial stability of the District, including management and service delivery efficiency. If the Mayor or the Council rejects such a recommendation, the Control Board has the power to implement the recommendation unilaterally, after consultation with Congress. FRMAA, § 207. FRMAA was later amended to give the Control Board the power to issue its own orders, rules or regulations in order to carry out its mandate. Such orders, rules and regulations are just as legally binding as if they came from the Mayor or head of a department or agency. See Pub. L. No. 104-208, § 5203.

As the District government considered how to combat a projected $85.4 million budget deficit in the first quarter of fiscal year 1997, one suggested cost-cutting measure was to change the way overtime pay for District employees was calculated. Memorandum of Points and Authorities in Support of Motion of the District of Columbia Financial Responsibility and Management Assistance Authority to Dismiss the Amended Complaint ("Defendants' Memorandum to Dismiss")(attached to Defendants' Motion to Dismiss the Amended Complaint (filed June 3, 1997))

at 5. The proposed overtime calculation would require 40 hours of actual work before an employee could begin to earn overtime pay. Under this new method, categories of hours in the work week other than actual work, such as holidays, annual leave, or sick leave, would no longer be counted for the purposes of computing overtime.

According to the Control Board, since non-union District employees were already subject to this method of calculating overtime, the recalculation would achieve its projected revenue savings by treating all District employees, union and non-union, alike with regards to overtime. Id., at 6. The major obstacle to the implementation of this plan was the existence of several collective bargaining agreements in effect between the District and its unionized employees which already mandated how overtime was to be calculated. Since the Mayor did not have the authority to unilaterally modify these existing collective bargaining agreements with respect to their overtime provisions, the Control Board circumvented the problem by exercising its rulemaking authority.

The Control Board issued an order on December 27, 1996 ("Order"), which is at the heart of this dispute. The Order required, in relevant part, that

> [n]otwithstanding the provisions of the Comprehensive Merit Personnel Act, D.C. Code §§ 1-601.1 *et seq.*, or any other District of Columbia law, statute or regulation, the provisions of the District Personnel Manual, or the provisions of any collective bargaining agreement, employees of the District of Columbia government will only receive compensation for overtime work in excess of 40 hours per week (or other applicable tour of duty) of work actually performed, in accordance with the provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

Resolution and Order (attached to Defendants' Motion to Dismiss the Amended Complaint (filed June 3, 1997)) at 2; see also Defendants' Memorandum to Dismiss at 7-8 (due to restraint on Mayor, "only alternative available to implement the proposal ... was action by the Authority").

Plaintiffs include several unions and four individual employees. The "union-plaintiffs" are

3

several labor organizations which represent District of Columbia ("District") government employees, and which negotiated the collective bargaining agreements allegedly abrogated by the Order on behalf of their members. The "employee-plaintiffs" are individual District government employees, who claim the Control Board's Order denies that overtime pay they are entitled to under the existing collective bargaining agreements ("CBAs"). Defendants are the Control Board and Anthony Williams, in his official capacity as the District's Chief Financial Officer.

According to plaintiffs' complaint, the Control Board's Order required the District to amend its overtime rules so that "leave used whether scheduled or unscheduled to include sick, vacation, holiday, personal, union, administrative or compensatory will no longer be substituted for time actually worked when computing overtime." Amended Complaint at ¶ 16. Since this change modified the overtime provisions in existing collective bargaining agreements, plaintiffs allege that the Control Board exceeded its statutory authority by requiring it. Furthermore, since the Order alters express terms of existing collective bargaining agreements, plaintiffs contend that the Order violates their rights under the Contract Clause of the United States Constitution. Finally, since the Order deprived covered employees of overtime compensation they had previously been entitled to, plaintiffs claim the Order violates the due process rights of covered employees. Plaintiffs seek declaratory and injunctive relief from the Control Board's Order, as well as an award to "pay District government bargaining employees any wages lost as a result of the implementation of the Control Board's illegal order." Amended Complaint at 8-9.

## DISCUSSION

Currently pending before the Court are defendants' Motion to Dismiss the Amended Complaint, as well as plaintiffs' Motion for Summary Judgment. The Court will consider each of

these motions in turn, as well preliminary matters raised by the defendants.

## I. Preliminary Matters

On January 4, 1999, plaintiffs filed a Notice of Filing [#24] of the case University of the District of Columbia Faculty Assoc./NEA, et al. v. District of Columbia Financial Responsibility and Mgmt. Assistance Auth., 333 U.S. App. D.C. 325, 163 F.3d 616 (1998)("UDC").[1] On October 6, 1999, the Court entered an order requiring, *inter alia*, that defendants address the applicability of UDC to this case. In its response to that order, filed on October 22, 1999, defendants raised three preliminary matters, which they allege are related to the UDC decision, and which must be resolved by the Court before consideration of the pending motions.

These preliminary matters, which the Court will address before turning to the pending motions, are: (1) whether the plaintiffs have the requisite standing to bring this matter; (2) whether the collective bargaining agreements at issue in this case were even in effect at the time of the Control Board's Order; and, (3) if so, whether those collective bargaining agreements require plaintiffs to seek resolution of this dispute through arbitration before proceeding to court.

## A. Standing

First, defendants assert that neither the union-plaintiffs nor the employee-plaintiffs have sufficient standing to maintain this suit against the Control Board. Defendants' theory, as the Court understands it, is that the employee-plaintiffs do not have standing because they have failed to

---

[1] In UDC, the faculty of the University of the District of Columbia ("University") challenged a Control Board order which allowed the University to reduce its faculty "notwithstanding the provisions of any collective bargaining agreement." UDC, 333 U.S. App. D.C. at 327, 163 F.3d at 618. The D.C. Circuit upheld a ruling of the district court which held that this order was *ultra vires*, since "Congress did not grant the Control Board the authority to abrogate existing contracts between the District and its employees." Id.

demonstrate a particularized injury, such as an actual denial or deprivation of overtime pay, which resulted from the Control Board's order.  As for the union-plaintiffs, defendants allege that since none of the employee-members can claim standing, the unions are deprived of associational standing as well.[2]

"In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III." Warth v. Seldin, 422 U.S. 498, 95 S.Ct. 2197 (1975).  As the Supreme Court has noted, "[a]s an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial power on his behalf." Warth, 422 U.S. at 498-99, 95 S.Ct. at 2205 (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703 (1962)).

In Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130 (1992), the Supreme Court upheld a line of jurisprudence which

> established that the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan, 504 U.S. at 560, 112 S.Ct. at 2136 (citations omitted).

---

[2] Lack of standing creates a defect in the Court's subject matter jurisdiction, necessitating dismissal under Federal Rule of Civil Procedure 12(b)(1).  See Haase v. Sessions, 266 U.S. App. D.C. 325, 329, 835 F.2d 902, 906 (1987)(citing Bender v. Williamsport Area School Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 1331 (1986)).  As standing bears directly on the Court's subject matter jurisdiction, defendants may raise the issue at this time.  See Fed. R. Civ. P. 12(h)(3).

In Lujan, environmental groups were challenging a rule promulgated by the Secretary of the Interior interpreting the Endangered Species Act. The Secretary claimed that the plaintiffs lacked the requisite standing to challenge the rule because they were not the direct subject of the proposed regulation. The Supreme Court considered the differences in standing between plaintiffs who sue over government regulation of themselves versus plaintiffs who sue over government regulation of others. Concluding that the environmental groups did not having standing, the Court held that

> [w]hen the suit is one challenging the legality of government action ..., standing depends considerably upon whether the plaintiff is himself an object of the action ... at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing ... the action will redress it.

Lujan, 504 U.S. at 561-62, 112 S.Ct. at 2137.

## 1. Standing of the employee-plaintiffs[3]

Applying Lujan to the present case, it appears to the Court that the employee-plaintiffs do not meet the required elements of standing. As the Supreme Court noted,

> [at] the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true.

Lujan, 504 U.S. at 561, 112 S.Ct. at 2137 (citations omitted).

The present case is at the summary judgment stage, and the employee-plaintiffs have, so far, failed to allege specific facts that are necessary to support their individual claims against the Control Board. The Control Board's Order primarily operates to void provisions of collective bargaining

---

[3] The employee-plaintiffs are John P. Frye, Albert C. Murray, Amos Sharpe, and Toni Sawyers.

agreements which allow hours other than actual work hours to count towards the computation of overtime. Since the collective bargaining agreements in question were signed by the unions as representatives of the bargaining unit, the employees cannot claim injury based on the violation of that contract. That is the unions' role, despite the fact that the employees might be third-parties adversely impacted by the Control Board's Order.[4]

The employee-plaintiffs, in order to assert their personal rights in this case, would have to demonstrate that the Control Board's Order directly caused them to be deprived of overtime pay to which they would have otherwise been entitled to. The Court cannot rely on hypothetical or theoretical injuries which could result from the Control Board's Order. Nowhere in their papers, from the amended complaint to the materials submitted in support of their motion for summary judgment, do the employee-plaintiffs make a specific allegation about injury resulting from the Order. Therefore, the Court concludes that the employee-plaintiffs lack the requisite standing to be

---

[4] Plaintiffs cite Anderson v. AT&T Corp., 147 F.3d 467 (6th Cir. 1998), for the proposition that individual employees can bring action under Section 301 of the Labor Management Relations Act ("LMRA") to enforce the terms of a collective bargaining agreement. Despite its pro-employee tone, Anderson is readily distinguishable from this case because the plaintiffs in that case were not members of the bargaining unit. Thus, Section 301, which contemplates suits between unions and employers, could not be read as a barrier to that employee suit. Since they were not members of the bargaining unit, they also had no fair-representation cause of action against the union which negotiated the agreement, and so these third-party beneficiaries of the collective bargaining agreement had to seek redress against the employer.

However, the Anderson court also rejected "AT&T's blanket argument that '[i]ndividuals do not have standing to enforce rights under a collective bargaining agreement when those rights belong to the collective whole." Anderson, 147 F.3d at 474. The court noted that "the Supreme Court held a generation ago that the policy considerations underlying Section 301 'foreclose [a] reading of § 301 to exclude all suits brought by employees instead of unions.'" Id. (citing Smith v. Evening News Ass'n, 371 U.S. 195, 200 (1962). The Sixth Circuit found that the employees had standing because the claims involved "specific wage and pension guarantees applicable to specific, identifiable employees." Id. Such specificity does not exist in this case as far as the employee-plaintiffs are concerned, and so Anderson is distinguishable on that point as well.

before the Court on this matter.  Consequently,  John P. Frye, Albert C. Murray, Amos Sharpe, and

Toni Sawyers are dismissed as plaintiffs from this case pursuant to Fed. R. Civ. P. 12(b)(1).

## 2.  Standing of the union-plaintiffs[5]

Having concluded that the employee-plaintiffs do not have standing, the Court now turns to

the issue of whether the union-plaintiffs have standing.  Defendants urge the Court to apply the test

for associational standing expounded by the Supreme Court in <u>Hunt v. Washington State Apple</u>

<u>Advertising Comm'n</u>,432 U.S. 333, 97 S.Ct. 2434 (1977).  In <u>Hunt</u>, the Washington State Apple

Advertising Commission ("the Commission"), a state agency comprised of apple farmers designed

to promote the state's apple industry, challenged the constitutionality of a North Carolina regulation

which prohibited the display of Washington State's apple grades on containers of apples traveling

into North Carolina.  A three-judge panel concluded that the regulation did interfere with the

Commerce Clause and granted the Commission the relief it requested.  On appeal North Carolina

challenged the standing of the Commission to challenge the regulation on its own behalf and on

behalf of its members.  Considering the issue of the Commission's standing, the Supreme Court

established a test for associational standing.  The Court held

> that an association has standing to bring suit on behalf of its members when: (a) its
> members would otherwise have standing to sue in their own right; (b) the interests
> it seeks to protect are germane to the organization's purpose; and (c) neither the
> claim asserted nor the relief requested requires the participation of individual
> members in the lawsuit.

<u>Hunt</u>, 432 U.S. at 343, 97 S.Ct. at 2442.

---

[5] The union-plaintiffs are the American Federal of Government Employees ("AFGE"),
AFL-CIO, and its affiliated Locals 383, 631, 727, 872, 1000, 1975, 2553, 2725, 2737, 2741,
2978, 3406, 3444, 3721, 3871; and the American Federation of State, County and Municipal
Employees ("AFSCME"), AFL-CIO, Council 20, and its Locals 877, 1033, 1200, 1808, 1959,
2087, 2091, 2092, 2095, 2096, 2097, 2401, 2743, 2776, 3758, 2921.

The Court proceeds under the assumption that the union-plaintiffs fall within the category of associations contemplated by Hunt. Applying Hunt, it is clear that the unions satisfy at least two of these elements. The protection of collective bargaining agreement negotiated by the union is clearly germane to the union's purpose, and the participation of the individual members of the union is not required in this lawsuit to seek declaratory and injunctive relief. However, defendants contend that the unions cannot make the requisite showing that their members have standing to sue in their own right. Defendants assumably contend that the unions' individual members do not have standing for the same reason the employee-plaintiffs do not have standing, namely because of a lack of a specific injury in fact.

However, since the unions are not relying solely on the associational standing doctrine to establish standing, Hunt is not necessarily dispositive of this case. The unions claim standing in their own right, as signatories to the collective bargaining agreements abrogated by the Control Board's Order. It is well established that unions do have standing to vindicate employee rights arising out of a collective bargaining agreement. As the D.C. Circuit has held, "when a claim derives from a collective bargaining agreement – an agreement negotiated by the union and to which it is a signatory – the labor organization is an appropriate party ... to vindicate employees rights." Office and Professional Employees Int'l Union, Local 2 v. Federal Deposit Insurance Corp., 295 U.S. App. D.C. 254, 257, 962 F.2d 63, 66 (1992). See also United Steelworkers of America, AFL-CIO v. Canron, Inc., 580 F.2d 77, 80 (3rd Cir. 1978)(union has interest in enforcing applicable contract provisions); Brown v. Sterling Aluminum Products Corp., 365 F.2d 651, 656 (8th Cir. 1966)(union, as the sole representative of the unit, has standing to enforce rights possessed by the bargaining unit as a whole).

In a reply memorandum filed on February 4, 2000, defendants allege that the authority relied

10

on by the unions to support their argument for standing are inapposite to this case because they interpret Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.* Defendants allege that since the LMRA does not apply to the political divisions of the United States or the several States, including the District of Columbia, cases granting unions standing to sue for violations of collective bargaining agreement do not apply in this case.  <u>Cf.</u> 29 U.S.C. § 152(2)(defining "employer" under LMRA).

It appears to the Court that the defendants have confused the separate issues of jurisdiction and standing.  The Court has jurisdiction over this matter pursuant to Section 105 of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 ("FRMAA"), Pub. L. No. 104-8, 109 Stat. 97 (1995).  The unions have not relied on the LMRA to establish jurisdiction. However, the Court must also evaluate whether the unions have the standing to invoke the Court's jurisdiction under FRMAA.  It is at this point that the Court looks to the cases cited by the unions as support for the proposition that the unions have standing to sue the Control Board over actions which abrogate collective bargaining agreements negotiated by the unions.  For these reasons, the Court finds that the unions do have sufficient standing to bring this action against the Control Board.

**B. Effectiveness of the collective bargaining agreements**

In addition to the Control Board's Order, the collective bargaining agreements between the District and the unions are also at the heart of this case.[6]  Defendants have raised the issue of whether

_____

[6]  On October 6, 1999, the Court ordered plaintiffs to submit clean copies of those collective bargaining agreement.  In response to that order, plaintiffs filed, on October 15, 1999, copies of the following agreements: (1) the Compensation Agreement Between the Government of the District of Columbia and Labor Organizations Representing Employees in Compensation Units 1 and 2 ("Compensation Agreement"); (2) the Master Agreement Between the American Federation of State  County and Municipal Employees, District of Columbia Council 20, AFL-CIO and the Government of the District of Columbia ("Master Agreement'); and (3) the

these collective bargaining agreements were even in effect on December 27, 1996, the date of the Control Board's Order. Since all three of plaintiffs' causes of action claim that an existing collective bargaining agreement was abrogated by the Control Board's Order, the Court must resolve this question before proceeding to the merits of the present motions.

Turning to the Compensation Agreement, it appears to the Court that this agreement was indeed in effect on December 27, 1996, the date of the Control Board's order. According to the terms of the Compensation Agreement, it was signed on March 17, 1993, and was effective through September 30, 1995. See Compensation Agreement at 15 (Article 20 – Duration). Although the Compensation Agreement did not have a roll-over clause which would automatically renew it until a successor agreement could be achieved, plaintiffs allege that the Compensation Agreement was extended in an agreement between the unions and the District regarding the ground rules for negotiating a successor compensation agreement. Plaintiffs offer a Memorandum of Understanding

---

Agreement Between the Board of Education of the District of Columbia and District Council 20, Local 2921, American Federation of State, County and Municipal Employees, AFL-CIO ("Board of Education Agreement").

According to plaintiffs, the Compensation Agreement applies to AFGE Locals 383, 631, 727, 872, 1000, 1975, 2553, 2725, 2737, 2741, 2978, 3406, 3444, 3721, 3871, and to AFSCME Locals 877, 1200, 1808, 1959, 2087, 2091, 2092, 2095, 2096, 2401, 2743, 2776, 3758.

According to plaintiffs, the Master Agreement applies to AFSCME Locals 1033 and 2097. Plaintiffs have since alleged that the Master Agreement was superseded by a successor contract, the Collective Bargaining Agreement Between Government of the District of Columbia General Hospital and Compensation Units 20 and 21 ("D.C. General Hospital Agreement"). See Plaintiffs' Reply to Defendants' Memorandum in Compliance with the Court's Order of October 6, 1999 ("Plaintiffs' Reply")(filed Jan. 14, 2000) at 10-11 (n.6). As this assertion has not been challenged by defendants, the Court accepts the substitution of contracts. From here on, the Court shall refer to the D.C. General Hospital Agreement in lieu of the Master Agreement.

According to plaintiffs, the Board of Education Agreement applies to AFSCME Local 2921.

("MOU") between the District and the unions, dated December 11, 1996, which established those ground rules. That MOU expressly restored the conditions of employment established under the original Compensation Agreement. <u>See</u> Memorandum of Understanding Between Unions Representing Employees in Compensation Units 1 and 2 and the District of Columbia ("1996 MOU") at 2 ("status quo shall be restored under the Compensation Agreement that was in effect on March 29, 1995")(attached to Plaintiffs' Reply (Exhibit 4)). As defendants have not challenged plaintiffs' version of events, the Court concludes that the Compensation Agreement resumed full effect on December 11, 1996, and remained in effect on December 27, 1996, the date of the Control Board's Order.

By its terms, it appears that the Board of Education agreement also had not yet expired by December 27, 1996. Although the Board of Education Agreement was effective as of October 1, 1990, until September 30, 1993, it provides for an automatic annual renewal unless one of the parties opts out of the contract. <u>See</u> Board of Education Agreement at 30 (Article XXIX). According to an affidavit executed by Michael Reichert, AFSCME Staff Representative, the Board of Education Agreement has been automatically renewed annually since 1993 and remains in full force. <u>See</u> Affidavit of Michael Reichert (attached to Plaintiffs' Reply). Defendants have proffered no evidence to the contrary. Thus the Court holds that the Board of Education agreement was effective at the time of the Control Board's Order.

The Court must reach the same conclusion with regards to the D.C. General Hospital Agreement. That agreement was signed on February 15, 1994, and, by its terms, was effective through September 30, 1995. D.C. General Hospital Agreement at 6 (Article 11). However, the D.C. General Hospital Agreement further provided that "[a]ll of [its provisions] shall remain in full

force and effect until a successor Agreement is achieved through collective bargaining or appropriate procedures ... ." D.C. General Hospital Agreement at 7. Plaintiffs represent that no successor agreement has ever been achieved, and defendants do not refute that position. Therefore, the Court concludes that the D.C. General Hospital Agreement was in effect at the time of the Control Board's Order.

Defendants have challenged whether the collective bargaining agreements at issue were in effect at the time of the Control Board's Order. Plaintiffs have offered sufficient evidence that they were, and defendants have neither challenged nor refuted that evidence. Therefore, the Court holds that all three agreements - the Compensation Agreement, the Board of Education Agreement, and the D.C. General Hospital Agreement - were in effect at the time of the Control Board's Order.

## C. Arbitration

Having concluded that the collective bargaining agreements in question were in effect at the time of the Control Board's Order, the Court must determine whether those collective bargaining agreements require the unions to arbitrate this issue before proceeding to court.[7] Regardless of the specific grievance procedures found in these agreements, the Court concludes that they are irrelevant to this proceeding. The unions are bringing action against the Control Board, which was not a party

---

[7] Defendants urge the Court to look at the grievance procedures found in Article 16 of the Compensation Agreement, Article 22 of the Master Agreement, and Article VI of the Board of Education Agreement. Since plaintiffs have shown that the D.C. General Hospital Agreement superseded the Master Agreement, the Court will focus on that agreement instead. Generally, the Compensation Agreement requires the parties to utilize the arbitration procedures found in local working agreements to settle violations of the agreement. Compensation Agreement at 10 (Article 16). The Board of Education Agreement lays out a detailed grievance and arbitration process for settling disputes between the union and the District. Board of Education Agreement at 5-10 (Article VI). The Court was unable to discern any specific grievance or arbitration requirements from the D.C. General Hospital Agreement.

to any of the collective bargaining agreements in question, as opposed to the District's government, which implements the policies imposed by the Control Board. This result is consistent with the result in UDC. In UDC, the Control Board authorized the University of the District of Columbia ("University") to implement a reduction-in-force ("RIF") in the faculty to achieve some revenue savings. The faculty union sued the Control Board, claiming that its authorization of the RIF was *ultra vires*, and also sued the University for breach of contract, claiming that its implementation of the RIF was a violation of the collective bargaining agreement between the faculty and the University. The D.C. Circuit affirmed the district court's holding that authorizing the RIF was indeed *ultra vires*, and remanded the breach of contract claim for a determination of whether arbitration was required. See UDC, 333 U.S. App. D.C. at 334, 163 F.3d at 625.

If the unions were suing the District itself for implementing the new overtime regulations crafted by the Control Board then that suit might be subject to mandatory arbitration. Furthermore, should the Court conclude that the Control Board's order was *ultra vires*, any claims against the District to recover backpay would be subject to the grievance and arbitration procedures mandated in the collective bargaining agreements between the unions and the District. At this point, however, this Court properly exercises jurisdiction over the unions' *ultra vires* claim, regardless of any grievance or arbitration clauses. See UDC, 333 U.S. App. DC at 329, 163 F.3d at 620.

## II. Plaintiffs' Motion for Summary Judgment

Having established that the unions have the requisite standing to bring this suit, that the collective bargaining agreements at issue were in effect at the time of the Control Board's Order, and that those agreements do not require arbitration, the Court is now ready to turn to the pending

motions. The Court first examines plaintiffs' motion for summary judgment.[8]

The first basis for the unions' challenge is that the Control Board's Order regarding the recalculation of overtime was beyond the scope of the Control Board's authority because it authorized the District to unilaterally abrogate collective bargaining agreements. To demonstrate this, plaintiffs must show that the Order actually did require the District to modify the overtime provisions in existing collective bargaining agreements to which it was a party. Plaintiffs must then show that this action was beyond the scope of authority given to the Control Board by Congress.

The Control Board's Order required that

> [n]otwithstanding the provisions of the Comprehensive Merit Personnel Act, D.C. Code §§ 1-601.1 *et seq.*, or any other District of Columbia law, statute or regulation, the provisions of the District Personnel Manual, **or the provisions of any collective bargaining agreement**, employees of the District of Columbia government will only receive compensation for overtime work in excess of 40 hours per week (or other applicable tour of duty) of work actually performed, in accordance with the provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

Resolution and Order (attached to Defendants' Motion to Dismiss the Amended Complaint (filed June 3, 1997)) at 2 (emphasis added).

Each of the agreements at issue in this case provides for the calculation of overtime in a manner which is dissimilar to the method outlined in Control Board's Order. Indeed it appears from the Order's very language that the Control Board anticipated some conflict with existing collective bargaining agreements. The Order mandates that overtime begins only after 40 hours of work actually performed. No such limitation is found in any of the overtime clauses of the collective

---

[8] According to Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

bargaining agreements, and all three agreements explicitly state that overtime does not require forty hours of actual work to achieve overtime pay. See Compensation Agreement at Article 8 (overtime begins with hours of work authorized in excess of forty hours in a pay status in a work week); Board of Education Agreement at Article VIII, Section R (overtime begins with hours worked beyond the forty hour administrative work week); D.C. General Hospital Agreement at Article 9 (overtime begins with hours worked beyond forty hours in an administrative work week). By implementing the requirement of forty hours of actual work, the Control Board's Order compelled the District to ignore the overtime provisions in existing collective bargaining agreements.

Since the Control Board's Order authorized the District to abrogate existing collective bargaining agreements with regards to the payment of overtime, the Court must now determine whether the Control Board had the authority to do so. Despite the fact that Congress has granted broad power to the Control Board over the District government's operations, that power is not unlimited. The D.C. Circuit has previously held that the Control Board does not have the authority to issue orders allowing instrumentalities of the District government to unilaterally modify portions of existing collective bargaining agreements. Orders of the Control Board which do so are without legal effect. See UDC, 333 U.S. App. D.C. at 332, 163 F.3d at 623.[9]

As previously discussed, UDC involved an order by the Control Board which authorized the University of the District of Columbia ("University") to implement a faculty reduction-in-force ("RIF") in a manner not consistent with the collective bargaining agreement between the University

---

[9] Although decided after the present motions were ripe, plaintiffs filed notice of the UDC decision on January 14, 1999 [#24]. In order dated October 6, 1999 [#26], the Court granted defendants an opportunity to file a memorandum addressing the applicability of UDC to the present case. Plaintiffs were also given an opportunity to reply to defendants' memorandum. These papers are considered along with the papers on the motion for summary judgment.

17

and its faculty association. The faculty challenged the Control Board's order as *ultra vires*. The district court (Kennedy, J.) granted summary judgment to the plaintiffs, and granted appropriate declaratory and injunctive relief. The D.C. Circuit upheld the district court's grant of summary judgment, and affirmed the district court's reasoning that "[n]othing in the FRMAA or in the subsequent congressional legislation cited by [the Control Board] gave the Control Board the authority to repudiate the CBA." UDC, 333 U.S. App. D.C. at 332, 163 F.3d at 623.[10]

Since UDC is factually analogous to the present situation, it controls the outcome of this case. Just as the Control Board lacked the authority to enable the University of the District of Columbia to enact faculty reductions-in-force outside the provisions of its collective bargaining agreements, so too does it lack the authority to enable the District to modify the terms for the payment of overtime set out in the collective bargaining agreements between the District and its unionized employees. To the extent that the Control Board's Order does so, it is without legal effect.

In conclusion, plaintiffs' motion for summary judgment is granted. Finding no genuine issue of material fact, the Court concludes that plaintiffs are entitled to judgment as a matter of law. The Court holds that the Control Board's order of December 27, 1996, with regards to the calculation of overtime pay, is invalid as it abrogates collective bargaining agreements to which the District was a party. Furthermore, the Control Board and the District are enjoined from following this overtime pay calculation with regards to employees covered by collective bargaining agreements in effect at the time of the Order.[11]

_____

[10] The legislative sources of power considered and rejected by the D.C. Circuit include the FRMAA, the 1996 Amendment to the FRMAA, and the Appropriations Act.

[11] As the Court has determined that the Control Board's Order was *ultra vires*, the Court need not and does not address the unions' challenge to the Order on constitutional grounds.

### III.  Defendants' Motion to Dismiss

Having held that the Control Board's Order was *ultra vires*, and having granted plaintiffs'

motion for summary judgment, defendant's motion to dismiss the complaint is denied as moot.

## CONCLUSION

For the reasons set forth in this memorandum plaintiff's motion for summary judgment is

granted, and defendant's motion to dismiss the complaint is denied as moot.  The Court shall grant

plaintiffs declaratory relief.  The Court declares that the Order of the Control Board at issue is

without legal effect, and both the Control Board and the District are hereby enjoined from

implementing it.[12]  An appropriate order accompanies this memorandum.

Date: SEP 2 2 2000

_____
**JOHN GARRETT PENN**
**United States District Judge**

---

[12] Consistent with UDC, any award for leave or overtime pay lost as a result of the Control Board's Order may be sought by individual employees through whatever grievance or arbitration procedures are found in their respective collective bargaining agreements.

19